We're going to go to the last case of the day. 21-32-21 United States v. Royel Page. Mr. Drykosen. Good afternoon, your honors, and may it please the court. My name is Justin Drykosen and I represent defendant appellant Royel Page. Mr. Page is here today to challenge his conviction on count one of his indictment, which charged him with conspiring to distribute heroin. But Mr. Page was not part of a drug distribution conspiracy and the government offered insufficient evidence to convict him of such. The second reason that Mr. Page is here is because this court should remand count one for a new trial because it was plain error for the court to fail to give a definitional instruction on conspiracy. In Mr. Page's case, there were not the classic indicators of a drug distribution conspiracy that this court often looks to. There's not evidence of fronting, not evidence of sales on consignment. There's not evidence that Hamlin directed Page who to sell to or how much to charge or where to sell. There's not evidence that Hamlin paid Page a commission or that Page received, or excuse me, that Hamlin received a cut of Page's sales. There's not any discussions about, I'll warn you about law enforcement. There's no discussions about a stash house. There's no evidence that Hamlin provided tools to Page to help Page effectuate distribution. So what does the government point to? Government points to a couple pieces of evidence that I submit are zero plus zero plus zero equals zero. Government says there's a phone call in which Hamlin proposes Page start selling to customers up north. What happens as a result of that discussion? Page declines to join his interest with Mr. Hamlin. He says no. Government says that that's affirmative evidence of a conspiracy. I submit that that's affirmative evidence that there was no joint criminal objective here. Same thing. There's a discussion about Mr. Hamlin asking if Mr. Page will help him learn how to twist, how to cut, how to adulterate the heroin. Mr. Page initially says, yeah, yeah, yeah, yeah, yeah, I'll help you. Subsequent phone call, 67A, he says, no, I'm not going to teach you that. Declines to join a joint criminal objective. So then the government says, okay, well, there's a ton of purchases here, and these are distribution level quantities. But it's brief, subsequently immediately admits that that's not enough to take us out of a buyer seller relationship and into a drug distribution conspiracy. So then they say, okay, there's a bunch of intercepted phone calls here. A lot of communications we're talking about. Okay, let's define what we're talking about. There are about 150 communications that were entered into the record. Approximately half of those are discussions between Terrence Hamlin and Torrance Harris. And those phone calls do not have anything to do with Mr. Page. They never mentioned him, and they never vaguely refer to him. The remainder phone calls, approximately 77, and I should say communications, because I believe they're phone calls and texts, are calls between Hamlin and Page. And the overwhelming majority of those calls, about 70 of the 77, are short calls. They're essentially orders. They're Page calling Hamlin to say, how much do you have available to buy? Hamlin's saying, how much can you buy? And then arranging a meeting point to exchange the drugs. And that was the pattern in this case. Page calls up Hamlin. He finds out how much he's able to buy. They arrange a meeting place. Hamlin gives Page the drugs. Page gives Hamlin the money. Hamlin's interests at that time are satisfied. He doesn't care how Page's distribution is going. And we know that because there's not a single phone call in this record in which Hamlin calls on Page and says, hey, how did that go? How did that drug distribution go? Not a single time where he's checking up on his supposed distributor. Counsel, in a lot of our cases, you see where the defense has asked for the buyer-seller instruction or argued that theory at trial. Do you concede that there has been no argument here? Or do you see something in the transcript that we, well, that I, let me speak for myself, that I don't see? Well, to answer your question, Your Honor, that argument was not advanced at trial. But I want to be sure that I don't conflate these two issues. Because I think in one instance, I'm of the evidence, regardless of how the jury was instructed. And my second point is that the jury was instructed, it was plain error for them to fail to get this buyer-seller instruction. And so I want to be sure that I don't accidentally conflate those. So on the sufficiency point, it wasn't directly argued. But this court's position on a plain error review is to look at the strength of the government's evidence. I accept that this is a high hurdle that I, as a defense attorney, have to overcome in this challenge. But this court has recently said that the height of the defense hurdle is commensurate with the strength of the government's evidence. Don't let the government hide behind the burden and ignore the evidence. I think to build upon Judge Jackson-Okuma's question, with regard to this distinction between a plain buyer-seller relationship versus the conspiracy, is that an argument that the defense made during the trial? I don't believe it was an argument that the defense made at trial. But it is an argument for us to consider right here, right now. That's what we need to take into account. And we need to analyze. Because there are case after case out of this court, where this court looks to see whether there was sufficient evidence to take the evidence out of equipoise of a buyer-seller versus a drug distribution conspiracy. This court does this. It's not rare. But it seems like we're not... I guess it's a continuum. And in one one, you have this two people jointly colluding to talking about customers and supplying the same customers. And then you have this whole spectrum in between. This case seems to fall somewhere within that spectrum. Does it not? Mr. Page and Mr. Hamlin were very close. They had a very close relationship. Mr. Hamlin gave Mr. Page discounts on occasion. There was one instance where Mr. Page wanted to return some drugs because of the quality. And he said, I can't let my customers think that I deal in bad drugs. And Mr. Hamlin said, yeah. And they did that arrangement. They talked about the business in general. So we're talking about someplace in the continuum. Is that correct? Your Honor, I take the position that this case is on the edge of the continuum that is simply a buyer-seller transaction. And let me address each of your points in turn. So the government relies on the fact that there's some discounted prices. That's not any different than a loyalty program at a consumer goods store. If you continue to go there, you get better prices or you get more rewards. And there's also evidence in the record that Mr. Hamlin refused to give Mr. Page a discount. So in 29A, Mr. Page tries to buy 100 grams of heroin at $70 a gram. Hamlin says, no. I can't let it go for less than $75 a gram. So it's not always true that he got a discount. And then secondly, the very first substantive buy that Mr. Page was charged with is that April 2nd. Mr. Hamlin says, I have 50 grams of heroin available to be bought. Mr. Page says, I can only pay for 45. And so what does Mr. Hamlin do? He ensures that Mr. Page has a calculator and a scale along so that Mr. Page doesn't accidentally get more than what he paid for. That's a buyer-seller relationship. With regards to the unsatisfactory product, the government concedes that that was not a sale or consignment. The reason we care about an unsatisfactory return of product is because that indicates that the supplier is not going to get paid until the distributor does his or her job. But that's not what's the evidence in the record here. And I also want to build up the context. The evidence in the record is that this was an 18-month relationship. Mr. Hamlin says he sold drugs to Mr. Page about three times a week. I did the back of the napkin math. It's about 230 transactions. So we're talking about one time in the record that there was some unsatisfactory product that was being able to be returned. That's not evidence of a drug distribution conspiracy. Similarly, there's one time in this record where Mr. Hamlin allows Page to owe about $200. So there's a partial credit that's given. One time, out of the course of over 200, this court's case, Neal, 907, Fed Third 511, says, you know what, that can actually be consistent with a buyer-seller relationship. Occasional credits to a buyer. And yes, these two appear to have to know each other well. But the fact that they've developed a cordial relationship over the course of 18 months shouldn't take this from the buyer-seller case that it is and move it over to a drug distribution conspiracy. You know what, and I apologize, I see my time is up. I would maybe briefly like to touch on the instruction issue, if any. Go ahead. I'll give you a minute or two. I'm sorry. So the failure to give the buyer-seller instruction 510A is definitional. It goes to the heart of what a conspiracy is and what a conspiracy isn't. It tells the jury that a conspiracy is not formed, even though a buyer may buy distribution-level quantities and subsequently sell them down the line. And this court has called the line between a buyer-seller and a drug distribution conspiracy to be vexing and blurry. It's hard for judges and lawyers to figure it out. It's impossible for a jury to intuit that there's this distinction that exists. That's why it was plain error to fail to give the buyer-seller instruction in this case. Thank you. And can you just real quick answer me, what's the prejudice to page if the conspiracy conviction stands? You know, I mean, the sentences are equal in concurrent terms, right, of 90 months. And if we were to vacate the conspiracy conviction, am I correct that his sentence wouldn't change? We are. I believe that Page's conspiracy conviction carried with it a five-year mandatory minimum term. And I believe that that would affect the package of sentencing that Mr. Page received. And so I think he would suffer prejudice. It does matter to him. Thank you so much. Okay, let's have Mrs. Hoffman. Good afternoon. May it please the court. Good afternoon. Pardon? Good afternoon. Good afternoon. May it please the court. Counsel, I'm Gail Hoffman. I represent the United States of America. I also am one of the attorneys that represented the United States of America at trial in this case. Counsel, in his argument to the court, minimized or tried to ignore the evidence of conspiracy that was presented at trial. My first point that I'd like to address is that he said that there was only one occasion of fronting and one occasion of returning bad drugs. I would note that the record is silent whether that occurred before or after the interceptions. Mr. Hamlin's telephone was intercepted beginning in late March, continuing through July 1st. Did you present more than one evidence of fronting? Or you did not call it consignment in the briefs, but a return. Why don't we go to what the facts were? A return of drugs and a discount price. No, the record is silent on that point. Neither was there a testimony that he did, nor was there a testimony that he didn't. I would note that this court has addressed conspiracy many times, and I think that this case falls within the holistic approach of analyzing a conspiracy, a totality of the circumstances, and each case speaks for itself. In this particular case, supporting conspiracy, we have calls that reveal a business relationship, not a buyer-seller relationship. There's a mutual need to keep Page's customers happy. One of the reasons why Mr. Hamlin lowered the prices per gram for Mr. Page is because he was such a good customer, and he wanted to business rearrangement, because the more that Mr. Hamlin was able to sell, the more that he was able to purchase. I'm not certain how that helps you, because a buyer-seller relationship is a business relationship, just as much as a co-conspirator relationship might be a business relationship. In addition, I'd like you to address, oh dear, I've lost my train of thought, so keep going. In this particular case, the parties, that would be Hamlin and Page, have an agreement to distribute the drugs exchange. Mr. Hamlin has a vested interest in Mr. Page succeeding, because the more that Mr. Page succeeds, the more it fuels Hamlin's business, and the more that Hamlin purchases from Torrance Harris, his supplier, the lower Mr. Hamlin's prices will be. In fact, Mr. Hamlin testified to that. So in this particular case, you have... But getting to, again, I'm always building off of Judge Jackson-Akume, which is great. But so long as the purchaser is someone in the middle of the distribution chain, that relationship is always there, right? Those incentives are always there. So for example, say I own a, I don't know, a car repair garage, and I need oil, and so I go to my oil distributor, and I buy oil regularly, once a week. The seller wants my business to succeed, because that means I'll keep on buying oil from the seller, but the seller is not engaged in a car repair business, right? And so that in itself is not sufficient to indicate some sort of conspiracy. Am I correct? But that's right. That's not the only point here. So it's one of the different factors that the court can look at in this holistic approach. You have Mr. Hamlin lowering the price for Mr. Page to help him move his business along. You have Mr. Hamlin allowing Mr. Page to return bad heroin to him. Again, each of these, in such a long conspiracy, you know, alleged by the government, and so many intercepted calls, each of these seem to me to be awfully few examples the government's able to put forth. One instance of returning product, one instance of lowering a price, each of which fall into Judge Lee's example of good business practices, how you keep customers coming back. I remember what I wanted you to address, Hamlin's own choice of words. You know, Page was a good customer. Hamlin doesn't say Page was a good partner, a good co-conspirator, a good right-hand man in my drug business. But he does have a conversation with Mr. Page. Mr. Hamlin and Mr. Page have a long conversation where Mr. Page had given Mr. Hamlin's number to Page's cousin Dion, and Mr. Hamlin had a long conversation with Mr. Page about advising him that this wasn't a good thing to do, that they were our business. And specifically, Hamlin describes it as our business. Look, here's the situation. Was there any more advice than don't bring your cousin into the business? Well, it was a long conversation. Were drug calls at cost more than a few times? I'm sorry. I'm sorry. Were the drugs sold at cost more than just a few times? You see, you argue that Hamlin sometimes sold drugs to Page at cost and advised Page about certain aspects of the business. But did any of what happened more than one time? The sale of drugs at cost. As the relationship continued, that was a fairly regular occurrence. I'm still struggling with that at cost as nothing more than good business practices. I've been seeing the same hairstylist for 17 years. I was one of his first customers. He still allows me to pay $2,500 prices. That's at cost. No inflation, no increases. It's up to me to tip, to do whatever I want. Doesn't make me in a conspiracy with him for anything to do with my hair. No, but you're probably, I mean, let's say a bad customer comes in. You're not advising your stylist, well, don't cut that person's hair. Well, that goes to Judge Rovner's question. Did that happen more than once? We have a recorded conversation where it occurred more than once. What do you mean by a recorded conversation where it happened more than once? Well, in during the interceptions, we captured one conversation where there was this discussion about Mr. Page's cousin, Dion, where he was warning him away from doing business with him, saying that you feed your family, keep them out of our business. It's not good for our business. And so there's that recorded conversation. Now it may have occurred, there may have been other warnings prior to the interceptions. There may have been more after, but he wasn't asked on. Mr. Pamlin didn't testify as to generally what happened before and what happened after. There were general conversations. We're talking about one conversation, right? One conversation that's in the record. I mean, the record is silent, whether it occurred on other occasions. Right. Well, who knows what they're talking about? They might be talking about a bearskin. I don't return drugs of poor quality. Is there any evidence in the record that Page got his money back, received a credit? Because if you look at page eight of the reply brief, Page says there's no evidence in the record on that point. Is he correct? No, he returned on the next day. He returned the drugs and then Mr. Pamlin supplied him with the gray that he was looking for. So it was a return of the bad drugs. Did he get his money back too? He didn't get his money back. He received drugs that were acceptable. How is that a benefit to Mr. Page? Pardon? Because this allowed him, his customer didn't like the drugs that had originally been provided. He said, this big spending customer was unhappy. He says, bro, this guy spends, I've got to keep him happy. Will you take it back? Do you have any of the gray? So that's on May 10th. On May 11th, Mr. Page returns the bad drugs and then Mr. Hamlin supplies him with the drugs that are acceptable to that client or that customer. And so what you see there is an agreement between Mr. Page and Mr. Hamlin to keep Mr. Page's customer happy, his big spending customer, because it's in both of their interest for page to be able to continue his business relationship with selling heroin to his big spending client. But isn't it as helpful if it's a buyer-seller relationship as it would be if they were in a conspiracy? You see, I'm wondering, could a reasonable jury, a properly instructed jury, have found that this was a buyer-seller relationship rather than a I don't think, you know, it's not our position that the jury was improperly instructed. If you look at Mr. Page's opening and closing argument, I mean, it's Mr. Hamlin's a bad guy. He's lying for his rule 35. This isn't my, you know, my client didn't engage in these transactions. That was his opening. That was his closing. You know, Mr. Hamlin is lying and my client didn't in these transactions. And so based on those arguments, which aren't, you know, aren't evidence, but that was the argument presented to the jury by Mr. Hamlin. I never said the buyer-seller instruction was never given. I understand that, but I'm just saying in terms of the theory of the defense or what the defense was arguing, the argument was, hey, I didn't participate in those transactions. And Hamlin is lying because he wants to reduce his sentence. So there has to be a reasonable inference in the evidence that there is a buyer-seller relationship. You know, granted the cases say that conflicting defenses are permissible, but in terms of not requesting one by Mr. Page's attorney, perhaps I think it's reasonably, it's arguable that this was a trial strategy. He was arguing for, you know, he was arguing for the whole thing. You know, this guy's lying and this isn't my client. He didn't do any of it. And if he had requested a buyer-seller instruction, it's like, okay, it's not my client, but assuming arguendo or arguably it is, or alternatively, these are just buyer-seller transactions. And so I don't view that the jury was instructed improperly. The evidence didn't support buyer-seller when there was evidence of the conspiracy with him warning Mr. Page away from his cousin, Dionne, with the return of bad heroin, with the incentives of lowering the price for more that you have. You know, the mutual need to keep the Page's customer happy. And even that call where they talked about working together up north, that would be the northern, some of the northern counties in Wisconsin. I mean, the call, even though it didn't transpire, the call evidences a level of trust because you have Mr. Page disclosing to Mr. Hamlin that he has customers up north, disclosing an aspect of his business. And then you have Mr. Hamlin disclosing his business plan that he wants to break into the market up north and he wanted Mr. Page to help So if it were simply a buyer-seller relationship without that same level of trust and mutual agreement to further the downstream sales, neither would have disclosed that type of information about their business to the other. With that, unless the court has other questions, the government rests on their brief and respectfully requests that this court affirm the conviction for conspiracy. Thank you. Thanks, Ms. Hoffman. Thank you. Okay, we're going to just, Mr. Drakosin, come on up. I'm so sorry. I know it's the end of the day. I will only take- Counsel, let me ask you this. Not the end of our day. If the government has alleged that this may have been trial strategy on the part of Mr. Page's counsel, that only wanting to just argue pure denial of participation in these transactions on the part of Mr. Page, and therefore don't even go into buyer-seller, should that affect our analysis on plain error review? And if so, how? No, Your Honor, it's the government's burden to prove every element of the offense beyond a reasonable doubt. And when we're looking for evidence of whether there was a drug distribution conspiracy here, we can't find any that takes it away from a buyer-seller relationship. So if I could just go through a couple of things that was said, I can't argue against a silent record. The second thing is the Cousin Dion call is called 49A. When he refers to it as our business, he's talking about the drug trafficking business generally. He's not saying that we have any sort of joint interest together. And that's rather banal advice. It's not bring a gun, use my car, sell for this amount of money, sell over here. It's keep the amount of competitors low. The second thing is that counsel mentioned that he was allowed to return heroin, you know, the one time. And she says, oh, the next day he gets what he wanted. He had to pay for what he wanted the next day. It's another buy. He had to go pay for the gray product that he got. And finally, I just want to say that we should not fall into the trap that the instruction 510A, the buyer-seller instruction, was solely the defendant's responsibility. On the evidence of this record, where we've just spent a bunch of time talking about buyer-seller and drug distribution conspiracy, this should have bothered everyone in that courtroom that the buyer-seller instruction was not given. So we're asking for his conviction, I count one, to be reversed. In the alternative, please remand for a new trial in front of a properly instructed jury. Thank you. All right. Now, hold on a minute. You can't just leave without us thanking you and thanking Ms. Hoffman. Mr. Drakosin, you were, where'd he go? You were, you were appointed. And you have the sincere thanks of the court for your hard work on behalf of your client. Thank you so much. And Ms. Hoffman, thank you for your hard work on behalf of your client throughout the years, not just today. So thank you both so very, very much. And this court is in recess until tomorrow morning at 930. Be well, everyone. Take care of yourselves. Bye.